IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEMETRIA BILLINGS,

    Plaintiff,

v.                                  CASE NO. 2:08-cv-0584-PWG

SHELBY COUNTY 911,

    Defendant.

### MEMORANDUM OPINION

Pending before the court is defendant Shelby County 911's motion for summary judgment (doc. 23), a brief in support of said motion (doc. 29), evidentiary submissions in support of said motion (docs. 24–28), plaintiff's opposition to said motion (doc. 32), evidentiary submissions in support of said opposition (docs. 33–35), and defendant's reply (doc. 43).[1] Having considered the motion and all other pleadings filed to date, the court finds as follows:

### Factual Background

Plaintiff Demetria Billings ("Billings"), a black female, was hired as a dispatcher for defendant Shelby County 911 ("Shelby 911") in September 1990. Billings Depo. 25; Ellison Aff. ¶ 6. On June 26, 2003, Billings was promoted to Supervisor by John Ellison ("Ellison"), Executive Director of Shelby 911. Ellison Aff. ¶¶ 2, 8. Her duties as Supervisor included supervising the call-taking and dispatching of at least four dispatchers on her shift. Ellison Aff. ¶ 8; Billings Depo. 182, 185. Her immediate supervisor was Kelli Brasher ("Brasher"), Deputy

---

[1] The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  *See* Doc. 12.

1

Director of Shelby 911. Ellison Aff. ¶ 8.

In 2004, Shelby 911 began performing law enforcement dispatch services. Ellison Aff. ¶ 4. It informed its dispatchers that training was available to dispatchers for performing law enforcement dispatch. *Id.* ¶ 27. Billings elected not to receive this training at that time. In 2006, Shelby 911 began offering $1.00 per hour additional pay to dispatchers who performed law enforcement dispatcher services. Billings then informed Ellison that she would like to receive the law enforcement dispatcher training. *Id.* Ellison asked Brasher what would be necessary to provide Billings with the training; Brasher informed him that they would need to hire more dispatchers in order to allow Billings to be trained. *Id.* Brasher then relayed this information to Billings. Billings Depo. 108–09; Ellison Aff. Exh. G. Ultimately, Billings did not receive the training; she argues that several other shift supervisors were able to train while they were on duty. *Id.* at 107.

Shelby 911 permitted dispatchers limited use of cell phones and personal exercise equipment to be used during breaks or down times if they were not distracting to other employees. Ellison Aff. ¶ 9. In May 2006, there was a fire at the dispatch facility and equipment being stored there had to be moved. Billings Depo. 145. Brasher then issued a written notice that employees were to "remove all exercise equipment from the premises immediately[, including] large hand weights, trampolines, and other equipment not easily put in a locker." Billings Depo. Exh. 3. The memo stated that the storage of such equipment was a "safety issue," but also that the large equipment was also "not appropriate for on-duty use." *Id.* Billings admits to having known about the change in policy and having received the memo. Billings Depo. 145–49,

151–52.[2] However, Billings states that Brasher gave her permission to bring her exercise trampoline into the dispatch facility for use during work as long as she stored it in her car when she was not working or using it.[3] Billings Depo. 145–49, 153. Shelby 911 believed that bringing the trampoline inside the building was in direct contradiction of the written policy, insubordinate, and distracting to the other dispatchers who were under Billings's direct supervision. Ellison Aff ¶ 10.  Billings was not approached by anyone regarding this incident. Billings Aff. ¶¶ 8–12. Billings argues that on several occasions another employee, Johnny Ingram, brought a complete stationary exercise bicycle into the dispatch facility to use during downtime; she states that he was neither counseled, reprimanded, warned, suspended, or disciplined in any way.[4] *Id.* ¶¶ 14–17.

In December 2006, Billings attempted to log on to the Computer Aided Dispatch ("CAD")[5] system at the supervisor workstation; she was unable to do so. Billings Depo. 111–12.

---

[2]Contrary to this testimony, Billings argues in her affidavit that she never received the written policy regarding exercise equipment. Billings Aff. ¶¶ 8–12. Although Brasher states that the memo was "posted on the info net for all employees to see," Brasher Depo. 77–78, Billings states that it does not contain any date stamp or time when the document was alleged created or distributed through the info net system, as occurs with all other documents distributed through the system. Pl.'s Brief at 7–8. However, the court cannot find any evidence which substantiates this claim.

[3]She states that Brasher told her: "Just don't leave it here. I don't care; just don't leave it here or leave it out." Billings Depo. 148–49.

[4]Billings provides no evidence supporting this claim.

[5]CAD is the primary computer program that Shelby 911 uses in its call center dispatch operations. The call center has seven workstations; dispatchers must log on to the CAD system at a workstation using a unique username and password at the beginning of their shift and log off at the end of the shift. Dispatchers do not have permanently assigned workstations, but are instead able to log onto any of the workstations. CAD defaults to the dispatcher's personalized screen settings. Ellison Aff. ¶ 13.

After successfully logging onto the system at other workstations, but still unable to log on at the supervisor workstation, Billings used Bryan Jebeles's ("Jebeles") log-in for the remainder of her shift. *Id.* at 112. Another employee informed Billings that Jebeles and Phillip Morris ("Morris") had been "messing" with her log-on and "were laughing [at] how mad [she] got because [she] couldn't log on." *Id.* at 113–14. On February 3, 2007, Billings reported the incident to Brasher, stating that Jebeles and Morris had tampered with her CAD log on by altering her personalized screen settings. Ellison Aff. ¶ 13.  Brasher interviewed Jebeles and Morris, who both denied the allegations, stating that they had the same problem with the CAD log on. Ellison Aff. ¶ 14; Brasher Depo. 18–19. Brasher reported to Billings that she was unable to conclude that any malicious activity had occurred. Billings still believed that Jebeles and Morris had tampered with her log-on, requesting a meeting with Ellison and putting her accusations in writing. Billings and Ellison met on February 15, 2007, and Billings provided Ellison with her written account on February 26, 2007. Ellison Aff. ¶ 15; Doc. 35 Exh. 6.

Ellison conducted his own investigation of Billings's allegations, interviewing several employees, and concluded that no one had tampered with her CAD log-on.[6] Ellison showed Billings the information he had uncovered that indicated that the problem was a hardware issue; Billings continued to insist that Jebeles and Morris were guilty of tampering with her screen settings. Ellison claims that this reaction, coupled with the length of time it took Billings to report this matter and the inconsistencies in her story, raised questions about her judgment,

---

[6]None of the employees interviewed reported knowledge of any employee tampering with Billings's screen settings. The technical support person allegedly recalled a problem with the multiple-monitor system at the supervisor's station that would have caused the problem Billings described. Ellison Aff. ¶ 16. Furthermore, there was no indication on Billings's log that anyone had tampered with her settings. Ellison Aff. ¶ 17.

credibility, and motivation for her accusations against fellow employees. Ellison Aff. ¶ 19.

On February 8–9, 2007, severe weather was expected. Billings was instructed to keep an eye on the weather and, if the inclement weather did not materialize, she could send a dispatcher home. Ellison Aff. ¶ 12; Billings Depo. 124–26. Although the weather was not as bad as expected, the dispatch center was consistently busy, so she did not send the dispatcher home. Billings Depo. 125–26. When asked in the morning why she did not follow instructions, she shrugged her shoulders and offered no explanation.[7] Ellison Aff. ¶ 12; Brasher Depo. 26–27.

On February 20, 2007, Ellison received a complaint from Kevin Peters ("Peters"), Chief of Police of the City of Montevallo Police Department ("MPD"), regarding Billings's potential misuse of the Alabama Criminal Justice Information ("ACJIC") Computer System. Glen Stephen Austin ("Austin") of the MPD reported that Billings called him while he was on duty on February 1, 2007, and asked him to "run someone" through "their system." Brasher Depo. Exh. 2; Ellison Aff. ¶ 20. Although Billings did not mention which system by name, Billings Depo. 58–59, Austin interpreted this as a request to conduct a search through the ACJIC computer system, which is against Shelby 911 policy and would potentially be punishable criminally; Austin refused the request. Brasher Depo. Exh. 2. Billings admits that she made this call during work hours and asked Austin to look up a phone number, but she asked, "[Do] you still have that system on your laptop[?]," referring to an online database to which Austin had previously subscribed. Billings Depo. 57–61, 73–74.

Following this allegation, Ellison put Billings on administrative leave without pay pending the completion of an investigation of the incident. Billings Depo. 44, 52; Ellison Aff. ¶

---

[7]This account of their conversation that morning is not disputed by Billings.

23. Ellison was unable to determine whether Billings was guilty of attempting to misuse the ACJIC computer system, but states that at best, Billings exercised extremely poor judgment by contacting an on-duty police dispatcher while she was at work and asking him to assist with personal business. Ellison Aff. ¶ 23.

Following the investigation, Billings was demoted by Ellison from her position as Supervisor to her former position as a dispatcher. Billings Depo. 54. A memo dated March 26, 2007, states that the decision was based on several factors: Billings unfounded accusations against two co-workers; her demonstration of "poor decision making [in] conduct[ing] personal business during work hours and . . . involv[ing] another public safety agency and their staff"; and continued insubordination. Brasher Depo. Exh. 6.

Shortly thereafter, Billings filed an EEOC charge claiming that she was discriminated against–namely, demoted and denied training opportunities–because of her race and sex. Compl. ¶ 4; Billings Depo. Exh. 2. Billings received her Notice of Suit Rights from the EEOC. Compl. ¶ 5; Answer ¶ 5.[8] On April 7, 2008, Billings filed this action, alleging that the demotion and employment practices of Shelby County 911 violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Compl. ¶ 1.

## Standard of Review

A moving party is entitled to summary judgment if there is no genuine dispute as to any material fact, leaving final judgment to be decided as a matter of law. *See* FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts, and any

---

[8]Billings was later terminated and filed a second EEOC charge. This lawsuit and opinion focuses solely on her demotion claims.

reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970). Once met by the moving party, however, the burden shifts to the nonmovant to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).

## **Legal Analysis**

In the absence of direct evidence of discrimination, courts analyze Title VII claims under the *McDonnell-Douglas* burden-shifting analysis, which first requires plaintiff to create an inference of discrimination by establishing a prima facie case. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish a prima facie case of discrimination under Title VII, plaintiff must generally prove: (1) that she is a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that she was treated less favorably than a similarly situated person outside of her protected class. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842–43 (11th Cir. 2000).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's

termination. *Id.* The defendant must "clearly set[] forth, through the introduction of competent evidence, the reasons for plaintiff's discharge." *Conner v. Fort Gordon Bus. Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985). This burden is "exceedingly light" and is "merely a burden of production and not a burden of proof." *Id.*

If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons were pretext for illegal discrimination. *Id.* (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)). A plaintiff may demonstrate pretext by directly persuading the court that a discriminatory reason more likely motivated the employer, or by indirectly showing the employer's proffered reason is unworthy of credence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). This can be done by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder would find them unworthy of credence." *Combs*, 106 F.3d at 1538. A reason is not a pretext for discrimination "unless it is shown both that the reason is false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 515 (1993)).

As an initial matter, this court questions whether plaintiff can prove her prima facie cases for either gender or race-based discrimination. She has directed the court to no competent evidence indicating that she was treated differently than similarly situated non-black persons or males. "To determine whether employees are similarly situated, [courts] evaluate 'whether the employees were involved in or accused of the same or similar conduct, and are disciplined in different ways.'" *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting

*Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). The conduct plaintiff claims the other employees engaged in was not substantially similar to the conduct for which she was demoted. She has not identified any evidence that any employee accused of similarly serious misconduct was not also demoted. Her argument that other employees received the law enforcement training while on duty where she was denied it also fails; she has not shown that these employees asked for the training during the same or a similar time period or that the dispatch center was equally busy during the time the other employees received such training. She also has not shown that she was replaced by a non-black person or by a male.

However, even if plaintiff had established a prima facie case, both her gender and race-based discrimination claims fail as a matter of law because plaintiff has tendered no evidence that defendant's stated legitimate non-discriminatory reasons for its actions are a pretext for discrimination.

First, this court finds that defendant has properly produced legitimate non-discriminatory reasons for its actions. Defendant's burden is only one of production. The proffered reasons of poor judgment and insubordination easily satisfy this burden as to her demotion; the understaffing concerns satisfy this burden as to her denial of training.

Finally, this court finds that plaintiff cannot demonstrate that defendant's proffered legitimate non-discriminatory reasons for her demotion and denial of training were pretext for gender or race-based discrimination. Expressly, plaintiff makes no attempt to prove pretext; instead she simply argues that defendant's lack of a legitimate non-discriminatory reason for her demotion relieves her of her burden. Pl.'s Brief at 35. Even if plaintiff was able to prove that she is not guilty of the conduct she is accused of or that defendant was mistaken as to the events

leading up to her demotion, it is defendant's belief at the time of the action that controls.[9] *Holifield v. Reno*, 115 F.3d 155, 1565 (11th Cir. 1997) ("[T]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."). Most importantly, plaintiff has not shown any evidence of discriminatory animus on the part of her supervisors.

Plaintiff has pointed to no evidence, other than the fact that she was a female, to show any gender discrimination.[10] She has not provided any evidence of gender-based comments or biases to support her claim. Similarly, she provides no evidence, other than the fact that she was the only black employee at Shelby 911, to show any race-based discrimination.[11] She has not

---

[9] Plaintiff also argues that defendant gave her conflicting reasons for her demotion. However, through the course of her deposition, plaintiff admits that all the reasons given in her demotion memo were discussed with her in her demotion meeting. Billings Depo. 54–55, 122, 144–45; *see also* Brasher Depo. Exh. 6.

[10] Billings testified in her deposition as follows:

Q. . . . Why do you think you were discriminated against because of your sex?
A. Being a black female.
Q. Do you have anything that you would tie just to being female; any discrimination that you think you suffered because you are a female?
A. No, not to my knowledge.

Billings Depo. 110–11.

[11] Billings testified in her deposition as follows:

A. [E]veryone else had no problem getting trained or was not intimidated. I'm the only black that has been there – until I was demoted, then they hired somebody else black – for seventeen years.
Q. And, other than that, is there any other reason that you think it was because of your race?
A. That's it so far.

Billings Depo. 110.

provided any evidence of race-based comments or biases to support her claim, even stating that no "supervisor or employee [has] ever [made] a comment that [she] thought was racially derogatory or discriminatory."[12] Billings Depo. 110.

Viewing the evidence in the light most favorable to the plaintiff, it is clear that plaintiff has failed to establish a genuine dispute as to any material fact regarding whether defendant's legitimate, nondiscriminatory reasons were pretextual for either gender or race-based discrimination. Therefore, plaintiff's claims fail as a matter of law and summary judgment is due to be granted to defendant.

## Conclusion

Having considered the foregoing and finding that the plaintiff has failed to establish a genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that defendant's motion for summary judgment (doc. 23) is due to be **GRANTED**. The court shall so rule by separate order.

**DONE** and **ORDERED** this 13th of July 2011.

*[signature: Paul W. Greene]*

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

---

[12] Plaintiff does reference two instances of possible racial comments made *after* her demotion. First, plaintiff provides an account of employee using the "N word" when telling a story. Doc. 35 Exh. 11. After asking another employee about it, plaintiff was informed that she had misheard and that the employee had actually said "new girl." *Id.* Second, she references an email dated August 20, 2008, which contains racially derogatory and offensive material. Ellison Depo. Exh. 15. However, even if plaintiff heard the first employee correctly, both instances were statements made by co-workers, not supervisors. These two instances do not arise to any actionable conduct and do not demonstrate racial animus by her supervisors.